UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

ROGER ALLEN PATTEE and
KIMBERLY ANN PATTEE,

Plaintiffs,

v.                    406CV028

GEORGIA PORTS AUTHORITY; DOUGLAS J.
MARCHAND, individually and in his official
capacity as Executive Director of the Georgia Ports
Authority; and DAVID A. SCHALLER, individually
and in his official capacity as Deputy Executive
Director of the Georgia Ports Authority,

Defendants.

## ORDER

## I. INTRODUCTION

Roger Pattee brought this action against his former employer, The Georgia Ports Authority (GPA), after being fired from his position with the Georgia Port Police (GPP) at the Port of Savannah (the Port). Doc. # 1, exh. 1 at 3. He claims GPA officials David Schaller and Douglas Marchand fired him after emails he sent to government officials precipitated an investigation into security at the Port. *Id.* at 27. As trial approaches, both parties have moved *in limine* for the Court to exclude certain evidence. Doc. ## 61-62, 63.

## II. BACKGROUND[1]

Pattee served as a GPP officer at the Port of Savannah from 1997 until 3/8/04. In 3/03, out of concern for the Port's security, Pattee sent an email outlining perceived Port security flaws to the Sheriff of Clayton County, Georgia, who was also a member of Georgia's Homeland Security Task Force. Eventually the email was forwarded to the Office of the Inspector General (OIG) of the State of Georgia. The OIG conducted an investigation of the Port, and Pattee cooperated with the OIG in that investigation. As part of his cooperation, Pattee disclosed fellow GPP officers' names and contact information in violation of GPA policy. Two officers who were contacted by OIG complained to Schaller about Pattee's disclosures. Schaller called in Pattee to investigate the disclosures and interrogated him in a GPA meeting room. Two other GPA officials -- Major Thomas Thompson and Investigator James Boatright -- unbeknownst to Pattee, listened to the meeting from a side office via a speaker-phone turned on in the meeting room.

The defendants claim Pattee lied during this meeting and was fired for lying. They wish to present Boatright's and Thompson's testimony to bolster their version of what transpired at the meeting. Pattee disputes the defendants' version of the meeting and claims that the eavesdropping violated state and federal law, and thus the eavesdroppers' testimony should be excluded (thus turning what happened at the meeting into a swearing match between himself and Schaller).

Pattee[2] also moves the Court to exclude the testimony of G. Paris Sykes -- the defendants' lawyer at the time of Pattee's termination --

---

[1] All facts derived from the parties' joint stipulation. Doc. # 66.

[2] Though Pattee's wife is still in this case as a co-plaintiff, for convenience the Court refers only to "Pattee" and "the plaintiff" in the singular form.

insisting that any advice Sykes gave defendants is legally irrelevant.

Finally, Pattee moves the Court to exclude evidence that Pattee performed his duties poorly. He argues that the defendants' sole argument throughout this litigation has been that Pattee was fired for lying during the meeting with Schaller. So the defendants, Pattee maintains, should not be allowed to present at trial a panoply of other reasons for his termination.

Plaintiff claims out-of-pocket medical expenses that would have been covered by GPA insurance had he not been fired. Those expenses, he contends, are recoverable damages. The defendants counter that Pattee's damages are limited to the insurance premiums; if his medical expenses were not covered by insurance, the defendants argue, it is because he failed to buy insurance after his termination. Thus, defendants seek to exclude evidence of his expenses.

III. ANALYSIS

A. Eavesdroppers' Testimony

Pattee claims that GPA officials "clearly violated the [law] and committed a felony" by listening to the Pattee-Schaller conversation through a speaker-phone, thus the officials' testimony should be excluded. Doc. # 62 at 4. The Court will focus on federal law to decide this federal evidentiary issue. *Borden, Inc. v. Florida East Coast Ry. Co.*, 772 F.2d 750, 754 (11th Cir. 1985) ("the admissibility of evidence in federal courts is governed by federal law"); *see U.S. v. Proctor*, 526 F.Supp. 1198, 1202 (D.Haw. 1981) ("regardless of the law of the state in [the eavesdropping] area, the Court need not determine whether state law imposes 'more rigorous requirements' than federal law"). The parties' arguments invoking *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) to establish that state law is relevant are misplaced as this case is based on a federal question of constitutional law and thus federal law controls the litigation's substance and procedure entirely. *See* doc. # 67 at 10-11 (citing cases in federal court pursuant to diversity of citizenship in which courts excluded evidence pursuant to "substantive" state evidentiary rules).

A person violates federal law when he "intentionally intercepts ... any ... oral ... communication," where "'intercept' means the aural or other acquisition of the contents of any ... oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2511(a); 18 U.S.C. § 2510(4) (hereafter, "Wiretap Act"). If an unlawful interception occurs, the contents of the interception and evidence derived therefrom are inadmissible in any trial. 18 U.S.C. § 2515; *see also Fleming v. U.S.*, 547 F.2d 872, 874 (5th Cir. 1977) ("[18 U.S.C. § 2515] should not be read in an overly literal fashion. The section's primary purpose is apparently to exclude evidence derived from illegal, rather than legal, wiretaps").

The Wiretap Act, however, is full of trap doors. For instance, no interception occurs where a telephone is the device used, the telephone is connected to a telecommunications service, and the telephone is being used in the ordinary course of business. 18 U.S.C. § 2510(5)(a). Furthermore, the law is not violated where an interception is made by a person acting under color of law and "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c).[3] These

---

[3] Whatever the precise definition of "color of law," GPA officials engaging in an employment-related investigation meet the requirement. *See Thomas v. Pearl,*

2

exceptions are termed, respectively, the "business extension exemption" and the "consent exemption." *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 581 (11th Cir. 1983).

Both exemptions could apply in this case. If the defendants are able to show at trial that Schaller (the GPA official interrogating Pattee) consented to the eavesdropping, the consent exemption defeats Pattee's argument. If the defendants are able to show that the telephone used to eavesdrop was connected to a telecommunications service, the business extension exemption would likely defeat Pattee's argument.[4]

The defendants need not make either showing, however, because the Wiretap Act also requires that, to qualify as an "oral communication," the person whose communication was intercepted must have "exhibit[ed] an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). Courts have interpreted this requirement to mean that the conversant must have a reasonable expectation of privacy in the conversation. *U.S. v. McKinnon*, 985 F.2d 525, 527 (11th Cir.1993); *accord Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 211 & n. 8 (5th Cir. 2001).[5] In actuality the section contains two slightly different requirements: (1) that the circumstances justify an expectation that the communication is not being intercepted; and (2) that the speaker "exhibits" that expectation.

Pattee argues only that he had a "reasonable expectation of privacy" during the conversation with Schaller because "the meeting took place in a conference room, and Pattee and Schaller were the only persons in the room." Doc. # 62 at 5. Pattee never addresses the seemingly patent unreasonableness of expecting answers to a superior's questioning in an internal investigation of misfeasance to remain private.

If the proper inquiry, however, is whether Pattee had a reasonable expectation that the conversation *would not be intercepted* (as opposed to a reasonable expectation of privacy

---

998 F.2d 447, 451 (7th Cir. 1993) (narrow reading of "color of law" must include "some logical and reasonable connection between the government worker's job description and eavesdropping").

[4] It is undisputed that the device used was a telephone (the first prong of the business extension exemption), and the Eleventh Circuit endorses a content-focused inquiry for "ordinary course of business" (the third prong of the business extension exemption). *Epps v. St. Mary's Hosp.*, 802 F.2d 412, 417 (11th Cir. 1986) (listening in on employee conversation is "ordinary course of business" when overheard conversation is one "in which the employer has a legal interest"). Though the defendants unquestionably had a strong legal interest in the content of the Pattee-Schaller conversation, an argument can be made that the surreptitious use of a speaker-phone as an electronic bug can never be the "ordinary course of business," no matter what the employer's interest in the content of the conversation. The Court need not decide this question.

[5] As the *Kee* court noted:

> 18 U.S.C. § 2510(2) protects oral communications "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). The legislative history of this section demonstrates that Congress intended this definition of oral communication to parallel the reasonable expectation of privacy test set out in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *See* S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2178.

247 F.3d at 211 n. 8.

3

in the contents of the conversation), the circumstance of the meeting -- an investigation into internal misfeasance -- would not play into the equation. Instead, the Court would need to hear evidence on the surroundings in the room during the interrogation. For instance, if the phone was sitting on the middle of the desk with a red, "speaker-on" light glowing, it might be deemed unreasonable for Pattee to believe the conversation was not being intercepted.

Whatever standard applies, Pattee never "exhibited" his expectation as required by 18 U.S.C. § 2510(2). In other words, unless something is said to lead a listener to believe that statements are private (*e.g.* "just between you and me," "off the record," or "can we discuss this matter in private?") such statements do not qualify as "oral communications" under the Wiretap Act. 18 U.S.C. § 2510(2). In that Pattee points to no evidence showing that he *exhibited* any expectation, the Court denies his first *in limine* motion.

### B. Attorney's Testimony

Pattee next seeks to exclude the testimony of G. Paris Sykes, defendants' attorney at the time of Pattee's firing. Doc. # 62 at 7-11. Pattee argues that Sykes's testimony about the advice he gave the defendants (that it would be lawful to terminate Pattee for lying) has no relevance, *see* F.R.Evid. 401, and that, even if relevant, the testimony should be excluded as prejudicial. *See* F.R.Evid. 403. Defendants respond that a punitive damages claim against them remains on the allegation that "their actions showed 'reckless or callous indifference' to Pattee's rights." Doc. # 55 at 13; *Pattee v. Ga. Ports Auth.*, ___ F.Supp.2d ___, 2006 WL 4128825 at *13 (S.D.Ga. 12/18/06). Evidence that defendants sought and received legal advice before terminating Pattee is highly relevant to whether they showed "reckless or callous indifference," so the Rule 401 argument is rejected. Furthermore, while the probative value of the advice may be outweighed by a danger of confusion of the issues or misleading the jury, the Court cannot say that those dangers *substantially* outweigh the evidence's probative value to the punitive damages claim, as required by Rule 403.

On the other hand, the fact that the defendants sought and received attorney advice is less probative on the issue of liability. Whatever probative value the testimony has on the issue of liability is substantially outweighed by the likelihood that the jury will be confused and misled by this attorney's testimony that he opined that what the defendants did was legal. For this reason, the Court is amenable to presenting a curative instruction contemporaneously with Sykes's testimony, if he plans to testify regarding the opinion he gave defendants. Alternatively, the Court can bifurcate the trial (liability first, then damages). The motion therefore is granted in part; the Court urges the parties to try to stipulate on the proper handling of Sykes's testimony concerning the opinions he gave the defendants.

The defendants also plan to offer Sykes's testimony that he advised the defendants (1) to investigate the other GPP officers' complaints about Pattee disclosing their contact information, and (2) to require all three officers -- Pattee and the two complainants -- to submit to a polygraph test when perceived inconsistencies appeared in the officers' stories. Doc. # 65 at 10-12. This testimony is relevant to whether the investigation of Pattee was a witch hunt by the defendants designed to manufacture a pretext for termination. Furthermore, this testimony presents no Rule 403 problems. The motion must therefore be

4

denied insofar as it challenges this testimony.

### C. Other Reasons for Termination

Two main issues will be sent to the jury on Pattee's First Amendment claim: First, whether his emails were a substantial or motivating factor in defendants' decision to terminate him, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); and second, "whether the [GPA] ha[s] shown by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct." *Id.* Pattee bears the burden of proof on the former; the defendants bear the burden of establishing the latter. *Id.*

Pattee attempts to conflate the issues into a single inquiry: "whether Pattee was fired for making a false statement to Schaller or for reporting his concerns about security at the Port of Savannah." Doc. # 62 at 12; doc. # 67 at 18. With the issue so framed, plaintiff argues that evidence of his past misconduct or poor performance on the job is irrelevant and thus inadmissible.[6] Doc. # 62 at 11-12. In other words, by Pattee's reasoning, whether he was a good or bad employee is irrelevant, so his job performance is not in issue.[7]

The Court rejects Pattee's issue-framing. The first question for the jury to decide is whether Pattee's emails were a substantial or motivating factor for his termination *vel non*. It is possible that a jury, given all the evidence, could conclude that the "lying" charge against Pattee was a pretext, and this finding, along with Pattee's evidence that he was terminated for sending the emails, would allow the jury to infer that Pattee was actually fired for his protected emails. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 154 (2000) (concurrence) ("evidence suggesting that a defendant accused of illegal discrimination has chosen to give a false explanation for its actions gives rise to a rational inference that the defendant could be masking its actual, illegal motivation"). Such a conclusion, however, is not inescapable; the jury could conclude that the charge that Pattee lied was a pretext, but defendants nonetheless terminated him for reasons other than his emails. *Cf. St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (reversing "Court of Appeals' holding that rejection of the defendant's proffered reasons compels judgment for the plaintiff").

Moreover, Pattee's service as an employee provides relevant context. For instance, were Pattee a stellar employee, the jury might have a hard time believing that defendants fired him for a single, seemingly insignificant lie. On the other hand, were Pattee an atrocious employee,

---

[6] Much of Pattee's argument focuses on F.R.Evid. 404, which deems "[e]vidence of a person's character or a trait of character ... not admissible for the purpose of proving action in conformity therewith on a particular occasion" with some inapplicable exceptions. *Id.* The only "action" Pattee is alleged to have committed is lying to Schaller, so the only applicability Rule 404 could have in this case would be if the defendants sought to introduce evidence of Pattee's character as a liar. But Pattee does not claim that defendants plan to do that; rather, he seeks to exclude such evidence because it tends to prove Pattee's character as a bad employee. This is not the type of character evidence Rule 404 operates to exclude. The Court will, however, read Pattee's brief as an argument that evidence of his character as a bad employee is inadmissible because his employment performance is irrelevant.

[7] Initially, the Court notes the likelihood that Pattee will attempt to introduce evidence of solid job performance. If such evidence is presented, Pattee will have put his job performance in issue, and the door will be open for defendants to rebut by presenting evidence of past misconduct and poor performance on the job. Job performance evidence, as will be explained *infra*, is admissible in any event.

5

the jury might rightly conclude that the defendants would be more inclined to fire him for a lie. In either case, the reason given for the termination would be "lying." Thus, the Court deems evidence of Pattee's job performance (good and bad) relevant and admissible.[8]

### 4. Medical Expenses

Defendants move to exclude evidence of out-of-pocket medical expenses incurred by Pattee after his termination, contending that the proper measure of damages "is the net loss of any wages and benefits incurred by the plaintiff from the date of his termination through the present." Doc. # 63. After termination, Pattee incurred $76,222.50 in out-of-pocket medical expenses that would have been covered by his GPA insurance.

"[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986). Thus, plaintiff is entitled to recover actual losses caused (directly and proximately) by the defendants' tort. *See Jackson v. Sauls*, 206 F.3d 1156, 1168 (2000) ("For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue").

Under the common law, however, plaintiffs are not entitled to recover all actual losses proximately caused by defendant's actions. Specifically, "one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort." RESTATEMENT (SECOND) OF TORTS § 918 (2006). This principle, known as "mitigation of damages" or "avoidable consequences," applies in § 1983 cases. *McClure v. Indep. Sch. Dist.*, 228 F.3d 1205, 1214 (10th Cir. 2000); *accord Tri County Indust. v. District of Columbia*, 200 F.3d 836, 840 (D.C. Cir.), *amended*, 208 F.3d 1066 (2000); *Lawson v. Trowbridge*, 153 F.3d 368, 376-77 (7th Cir. 1998); *O'Neal v. Gresham*, 519 F.2d 803, 805-06 (4th Cir. 1975). "Moreover, failure to mitigate is an affirmative defense and the party asserting it bears the burden of demonstrating the opposing party's failure to act reasonably under the circumstances." *Tri County*, 200 F.3d at 840.

Therefore, the two issues touching Pattee's post-termination, out-of-pocket medical expenses are (1) were the expenses proximately caused by his termination, and if so (2) should the defendants be allowed to present evidence that Pattee could have mitigated the expenses by a reasonable effort or expenditure?

---

[8] The Court must note what past-behavior evidence is *not* admissible to prove: that "Pattee's complaints about the port were ... exaggerated." Doc. # 65 at 12. At this point, the accuracy of the allegations in Pattee's emails is irrelevant. As this Court ruled, the emails were protected by the First Amendment, and retaliating against Pattee for sending them would constitute a violation of his First Amendment rights. *Pattee v. Ga. Ports Auth.*, __ F.Supp.2d ___, 2006 WL 4128825 at *6 (S.D.Ga. 12/18/06). Thus, the example given by the defendants, testimony from "Major Tommy Thompson ... about an incident when ... Pattee mistakenly thought the port was under attack, [sic] and alerted the military," doc. # 65 at 12, is irrelevant and inadmissible. Nowhere do the defendants suggest that Pattee's excessive zeal constituted misconduct or poor performance; they simply wish to cast his emails in a negative light. That they cannot do because, again, the emails are protected by the First Amendment. *See Pattee* 2006 WL 4128825 at *6.

Initially, the Court must address what the defendants have framed as an issue of "value." The value of lost health insurance benefits, they argue, is "the cost of health care premiums that would have been paid by the employer if not for [Pattee]'s discharge." Doc. # 63 at 2. Though many courts have agreed with this proposition, *see infra*, this Court cannot.

No rational person would pay today for health insurance covering yesterday, assuming a healthy yesterday. The present value of past health insurance, given a healthy past, is zero. Therefore, when an employee is fired, remains healthy for two months, then gets more insurance, he is not entitled to any compensation for the health insurance coverage he would have had during the two months because it is valueless; the employer's wrongful termination cost him nothing insofar as health benefits are concerned. To say that the employer must award him the premiums that the employer would have had to pay incorrectly focuses on what the employer would have spent rather than on the actual loss the plaintiff suffered. *But see EEOC v. Dial Corp.*, 469 F.3d 735, 744 (8th Cir. 2006) (Title VII case: "The court's limited award was reasonable, for this insurance coverage, not the proceeds, is the benefit for which the employer must be held liable" (quote omitted)); *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 965 (4th Cir. 1985) ("The value of being insured for a given period is precisely the amount of the premiums paid"); *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1185-86 (6th Cir. 1983) (ADEA case: "However, Plaintiff is entitled to the health benefits he would have received in the eleven months between his discharge and the trial. He has shown that he would have received $715 in health insurance if Sun had not illegally discharged him"); *Jacobson v. Pitman-Moore, Inc.*, 582 F.Supp. 169, 179 (D.Minn.1984) (ADEA case: "The insurance benefits plaintiff lost are not any less of a monetary benefit to her because she could not afford to replace her insurance benefits or because she did not become sick"). In fact, any award in back-pay the plaintiff receives should be reduced by the withholdings that would have been made for health insurance. *See EEOC v. Serv. News Corp.*, 898 F.2d 958, 964 (4th Cir. 1990).

On the other hand, assuming $75,000 in medical expenses yesterday, any rational person would pay, today, up to $75,000 for health insurance covering yesterday. The present value of that past health insurance is $75,000. The corollary is that when an employee is fired and incurs $75,000 in medical expenses that would have been covered had he not been fired, the actual loss suffered is $75,000. *See Hester v. Int'l Union of Operating Eng'rs*, 941 F.2d 1574, 1583-84 (11th Cir. 1991) (Labor-Management Reporting and Disclosure Act case: wife's cancer operation, which would have been covered by insurance but for plaintiff's unlawful termination, was an appropriate part of damages); *accord Galindo v. Stoody Co.*, 793 F.2d 1502, 1517 (9th Cir. 1986) ("Where an employee's fringe benefits include medical and life insurance, a plaintiff should be compensated for the loss of those benefits if the plaintiff has purchased substitute insurance coverage *or* has incurred, uninsured, out-of-pocket medical expenses for which he or she would have been reimbursed under the employer's insurance plan" (emphasis added)).

The "value" of health insurance is only equivalent to the insurance premiums being paid if that value is assessed on the day of the tort (past-assessed value), as opposed to assessed today (present value). The *past-assessed* value of health insurance lost -- assessed as if it were the day of Pattee's termination -- would be the amount of premiums. Tort liability, however, is

7

not so constrained. Tort liability is based on the actual loss to the plaintiff, not on a projection of what the loss might be at the time the tort is committed. The goal of tort law, after all, is to make the plaintiff whole.

For example, Plaintiff and Defendant are camping in the woods without any access to medical care when Defendant tortiously cuts Plaintiff's arm. The cut causes $10 worth of damage, but there is a 50% chance that the cut will become infected and cause loss of the arm, say $100,000 in damage. When suit is brought a year later, the value of Plaintiff's loss is not calculated from the time of the tort ($10 + 50% x $100,000 = $50,010); rather, the value is calculated by looking at the *actual* loss suffered by Plaintiff, *i.e.* whether Plaintiff presently has his arm (yes: $10 in damages; no: $100,000 in damages). *See Stachura*, 477 U.S. at 307 ("Deterrence is also an important purpose of [the common-law tort] system, but it operates through the mechanism of damages that are *compensatory* -- damages grounded in determinations of plaintiffs' actual losses").

Having dispelled any notion that the insurance premiums represent the "value" of the past insurance to Pattee, the Court will continue to the issue of proximate cause. To establish proximate cause, a plaintiff must show that "such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Jackson*, 206 F.3d at 1168. If Pattee can convince the jury that at the time of his termination it was reasonably foreseeable that he would incur all the medical expenses claimed, and that those expenses would have been covered by his GPA insurance, he is entitled to recover his actual losses. In this case, his actual losses are out-of-pocket medical expenses; in another case, the cost might be premiums paid on comparable insurance between jobs.

Reasonable foreseeability serves to cut off liability at some point. For instance, while it will likely be found to be reasonably foreseeable that Pattee would incur some medical expenses after termination, at some point the jury will determine that a particular amount of incurred expenses were not reasonably foreseeable.

Next the Court must determine whether the defendants can argue that Pattee's failure to purchase substitute insurance after his termination constituted a failure to mitigate damages. "The doctrine is simple: when a tort victim fails to take reasonable steps to mitigate his damages, those damages are either cut down or eliminated altogether under the principle of 'avoidable consequences.'" *Lawson*, 153 F.3d at 377. Tweaking the above hypothetical, suppose Plaintiff and Defendant are camping in the woods and Defendant tortiously cuts Plaintiff, but Plaintiff has an antiseptic, which he fails to apply. If the cut develops an infection and Plaintiff loses his arm Defendant may, at trial, present evidence that it was unreasonable for Plaintiff to fail to use the antiseptic. *See id.*

The situation here is analogous: just as the antiseptic insured against future damage to Plaintiff's arm, Pattee could have insured against future medical expenses by procuring substitute insurance. Thus, at trial, defendants will be allowed to present evidence that it was unreasonable for Pattee to fail to purchase substitute insurance after his termination. *See Serv. News Corp.*, 898 F.2d at 964 (limiting application of *Fariss* (holding insurance premiums, not actual loss, are what plaintiff should recover) where the facts "reflect a serious effort to obtain other insurance"); *see also Lawson*, 153 F.3d at 376-78 (holding that a detainee's failure to post bond to mitigate future damage while stuck in jail was reasonable

as a matter of law, where the detainee would have had to divert funds from paying his rent to cover his bond; "Creating a bigger crisis (eviction) by solving the immediate one is not an opportunity for mitigation...").

In conclusion, defendants' motion *in limine* to exclude evidence of Pattee's post-termination, out-of-pocket medical expenses must be denied. Pattee will be entitled to recover if he establishes at trial that such expenses were reasonably foreseeable at the time of his termination. The defendants may establish that Pattee's failure to purchase at least minimal health insurance after his termination was unreasonable, in which case the jury will be allowed to reduce any medical-expenses award.

## IV. CONCLUSION

Plaintiff Roger Allen Pattee's motion in limine is ***GRANTED IN PART*** and ***DENIED IN PART***. Doc. # 61. The parties shall in good faith attempt to stipulate how the testimony of G. Paris Sykes will be handled at trial (*i.e.*, address whether a curative instruction will suffice, or whether the trial instead should be bifurcated). The motion in limine of defendants Georgia Ports Authority, Douglas J. Marchand, and David A. Schaller is ***DENIED***. Doc. # 63.

This 16 day of April, 2007.

*[signature]*
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA